# IN THE SUPREME COURT OF TEXAS

No. 19-0694

IN RE C.J.C., RELATOR

ON PETITION FOR WRIT OF MANDAMUS

**Argued April 22, 2020**

JUSTICE BLAND delivered the opinion of the Court.

JUSTICE LEHRMANN filed a concurring opinion.

In *Troxel v. Granville*, the United States Supreme Court held unconstitutional a trial court's order requiring a fit parent to permit visitation with her children's grandparents.[1] The Court recognized that the United States Constitution "protects the fundamental right of parents to make

---

[1] 530 U.S. 57 (2000). In *In re Mays-Hooper*, we recounted the various opinions in *Troxel*:

A plurality of four justices found the visitation statute in *Troxel* unconstitutional as applied, pointing to three factors: (1) the child's mother was not unfit, (2) her decisions about grandparent access were given no deference, and (3) she was willing to allow some visitation. *Troxel*, 530 U.S. at 68–71. The plurality declined to say when a visitation statute would violate the Due Process Clause facially, as "the constitutional protections in this area are best 'elaborated with care.'" *Id.* at 73 (quoting *id.* at 101 (Kennedy, J., dissenting)). Justice Souter concurred in the judgment, but would have held the statute unconstitutional on its face. *Id.* at 76–77. Justice Thomas concurred in the judgment, noting only that neither party challenged the Court's substantive-due-process jurisprudence, and that he would have applied a strict-scrutiny standard of review. *Id.* at 80. Justices Stevens, Scalia, and Kennedy each dissented in different opinions for different reasons. *Id.* at 80–102.

189 S.W.3d 777, 777–78 (Tex. 2006) (per curiam) (citations altered).

decisions concerning the care, custody, and control of their children."[2] To protect that right, a plurality in *Troxel* applied "a presumption that fit parents act in the best interest of their children."[3]

We have similarly recognized that "[t]he presumption that the best interest of the child is served by awarding custody to [a] parent is deeply embedded in Texas law."[4] The government may not "infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better decision' could be made."[5] Even before *Troxel*, the Texas Legislature adopted a parallel presumption, requiring that a child's parents be appointed managing conservators in initial child custody suits unless it "would significantly impair the child's physical health or emotional development."[6]

The statutory presumption governing original custody determinations, however, is not carried forward into the statute governing proceedings to modify those determinations.[7] Thus, we have held that the statutory presumption does not apply in modification proceedings.[8] The question presented in this case is whether the presumption that fit parents act according to the best interest

---

[2] *Troxel*, 530 U.S. at 66 (plurality opinion); *see id.* at 77 (Souter, J., concurring) ("We have long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment."); *id.* at 80 (Thomas, J., concurring) (agreeing with the plurality that there is a "fundamental right of parents to direct the upbringing of their children").

[3] *Id.* at 68 (plurality opinion).

[4] *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990)).

[5] *In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007) (per curiam) (quoting *Troxel*, 530 U.S. at 72–73).

[6] TEX. FAM. CODE § 153.131(a) (providing that "a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators" unless such an appointment "would significantly impair the child's physical health or emotional development").

[7] *See id.* § 156.101(a)(1) (stating, as applicable here, that a court may modify a custody order if it is "in the best interest of the child" and "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed").

[8] *See V.L.K.*, 24 S.W.3d at 339–40; *Taylor v. Meek*, 276 S.W.2d 787, 790 (Tex. 1955).

of their children applies when modifying an existing order that names a parent as the child's managing conservator. Because a fit parent presumptively acts in the best interest of his or her child and has a "fundamental right to make decisions concerning the care, custody, and control" of that child, [9] we hold that it does.

# I

## A

Abigail was born in 2014.[10] Abigail's father, C.J.C., is the relator in this mandamus proceeding. Abigail's mother died in a car accident when Abigail was three years old.

Abigail's father and mother lived together from 2011 to 2016 and never married. In 2016, Abigail's father filed a suit requesting that a court determine conservatorship, possession, and child support for Abigail. At the conclusion of that proceeding, the trial court named Abigail's mother and father her joint managing conservators. The order granted Abigail's mother the right to designate Abigail's primary residence and granted Abigail's father regular periods of possession. The court adopted the parents' "custom possession order" that divided possession almost equally by the time Abigail was three.[11]

---

[9] *Troxel*, 530 U.S. at 72 (plurality opinion).

[10] The names appearing in this opinion are fictitious. *See* TEX. FAM. CODE § 109.002(d) ("On the motion of the parties or on the court's own motion, the appellate court in its opinion may identify the parties [in a suit affecting the parent-child relationship] by fictitious names or by their initials only.").

[11] The custom order provided for stepped-up visitation as Abigail grew older. Abigail's father initially had possession of Abigail every second and fourth Thursday evening through Friday evening, every first, third, and fifth weekend, fourteen days in the summer, and alternating holidays. On Abigail's third birthday, the order increased her father's possession to include Wednesday through Friday plus weekends for the second and fourth weeks of the month.

3

Abigail's mother became involved in a relationship with Jason. By September 2017, Abigail and her mother had moved into Jason's home. Until her mother's death, Abigail resided with her mother in Jason's home during her mother's periods of possession.[12]

In January 2018, Abigail's mother petitioned to modify the existing court order. She sought increased child support and to modify Abigail's possession schedule. Abigail's father answered and asked that the court deny the requested relief.

Abigail's mother died in July 2018 while that suit was pending. Abigail began to live exclusively with her father. Her mother's attorney filed a suggestion of death,[13] and Abigail's father moved to dismiss the modification proceeding.

While the motion to dismiss was pending, Abigail's maternal grandparents petitioned to intervene in the modification suit. The grandparents asked to be named joint managing conservators with Abigail's father.[14] Jason also petitioned to intervene, seeking similar relief. Both Jason and Abigail's grandparents asked for court-ordered visitation with her. Abigail's father objected to court-ordered visitation and moved to strike both petitions for lack of standing, which the trial court denied.[15]

Abigail's father sought mandamus relief in the court of appeals. The court of appeals granted relief in part, concluding that Abigail's grandparents had no standing to seek

---

[12] Jason represents that he and Abigail's mother became engaged to be married in April 2018.

[13] *See* TEX. R. CIV. P. 151.

[14] The grandparents alleged standing to intervene under Family Code sections 102.004 and 153.433. Section 102.004 sets forth specific standing requirements for grandparents, while section 153.433 provides the grounds on which grandparents may be awarded "reasonable possession of or access to a grandchild." TEX. FAM. CODE §§ 102.004, 153.433.

[15] Family Code section 102.003, titled "General Standing to File Suit," enumerates fifteen categories of persons who have standing to file a suit affecting the parent-child relationship. *Id.* § 102.003(a). A person who has standing under section 102.003 also has standing to file a suit for modification of an existing order. *Id.* § 156.002(b).

conservatorship of Abigail because no evidence existed that her father's conservatorship "would significantly impair [Abigail's] physical health or emotional development," as the statute governing grandparent intervention requires.[16] But the court of appeals determined that Jason had standing to intervene because he had exercised "actual care, control, and possession" of Abigail when she resided with her mother, for at least six months preceding her mother's death.[17] We denied the parties' requests for mandamus relief in this Court.

The trial court then held an evidentiary hearing. Jason testified, along with Abigail's father, grandmother, and therapists. Abigail's father agreed that Abigail's maternal grandparents should remain active in her life. He stated that Abigail's grandparents could see her "on a regular basis," noting that they had visited Abigail and that he had invited them to attend Abigail's activities since her mother's death.

Though Abigail's father did not object to Abigail's seeing Jason while she visited her grandparents, he objected to Jason's having a legal right to possession of Abigail "on his own." "As her father and a fit parent," Abigail's father testified, "I don't see why anyone else outside of

---

[16] *In re Clay*, No. 02-18-00404-CV, 2019 WL 545722, at *5–6 (Tex. App.—Fort Worth Feb. 12, 2019, orig. proceeding [mand. denied]) (mem. op.); *see* TEX. FAM. CODE § 102.004(a)(1) (providing that in addition to the general requirements set forth in section 102.003, grandparents have standing to seek managing conservatorship if "the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development"). Abigail's grandparents also urged standing under section 153.433(b), but as the court of appeals pointed out, this provision "does not confer standing on a grandparent to . . . intervene in a pending [suit]; it provides for the specificity required in an order granting possession or access to a grandchild." *Clay*, 2019 WL 545722, at *6.

[17] *Clay*, 2019 WL 545722, at *8–9 (quoting TEX. FAM. CODE § 102.003(a)(9) (conferring standing on "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition"), and *id.* § 102.003(a)(11) (conferring standing on "a person with whom the child and the child's . . . parent have resided for at least six months ending not more than 90 days preceding the date of the filing of the petition if the child's . . . parent is deceased at the time of the filing of the petition")).

her mother or myself would have those rights to visitation and to make decisions for her." Abigail's father further testified that Abigail had expressed no desire to visit Jason.

Over Abigail's father's objection, the trial court entered temporary orders naming Jason a possessory conservator of Abigail. Those orders grant Jason an unrestricted "duty of care, control, protection, and reasonable discipline" during his periods of possession. The court also granted Jason possession of Abigail for six hours every second and fourth Saturday for four months, followed by three months during which Jason would additionally have overnight possession every second and fourth Saturday, from noon Saturday until Sunday afternoon. The trial court further stated that, at the expiration of those seven months, the parties "will be back here for a final hearing" or will "have a mediation at which [they] will be able to work out a schedule on an ongoing basis."

The court ordered Abigail's father and Jason to electronically "communicate regarding the child." The court warned that it might order "reunification therapy" if the parties "get into a situation where I feel like there needs to be another therapist involved to help this child." "The [c]ourt has determined what is in [Abigail's] best interest," it continued, "and you are to make this as agreeable as you can force yourself to do."

In addition to these periods of possession, the court granted Jason "the right to confer with [Abigail's] counselor . . . regarding his visits with the child" and "the right to receive information regarding school activities and attend activities accompanied by [Abigail's grandparents] at the [grandparents'] election." The orders provide that, during Jason's period of possession, Abigail's grandparents "shall be present for the comfort of the minor child." And the orders grant Jason "the

6

right to consent to medical, dental, and surgical treatment during an emergency" during his periods of possession.

Abigail's father filed a second petition for writ of mandamus in the court of appeals, challenging the temporary orders. The court of appeals denied relief.[18] He then petitioned this Court for relief, arguing that the trial court's orders violate his right to parent Abigail without government intervention.[19]

**B**

Abigail's father observes that no evidence shows, and no one contends, that he is an unfit parent. The trial court therefore had no basis to name Jason as Abigail's possessory conservator, he argues, nor to order that Jason have periods of possession over her father's objection. Invoking *Troxel* and decisions from this Court, Abigail's father argues that he has a "fundamental due process right to the presumption that, as a fit parent, he is acting in the best interests of his child and should be able to do so free from state interference." Because Jason did not rebut the presumption established in *Troxel* and reflected in our common law, Abigail's father continues, the trial court's orders are an abuse of discretion.

Relying on our decision in *In re V.L.K.*,[20] Jason responds that no fit-parent presumption exists in suits seeking to modify an original custody determination. In that case, we did not refer to *Troxel* or to the constitutional presumption *Troxel* applied. But with respect to the Family Code's statutory presumption, we held: "Because the Legislature did not express its intent to apply

---

[18] 592 S.W.3d 165 (Tex. App.—Fort Worth 2019, orig. proceeding) (per curiam) (mem. op.).

[19] We granted Abigail's father's motion to stay the temporary orders while the petition was pending.

[20] 24 S.W.3d 338 (Tex. 2000).

7

the presumption in Chapter 156 modification suits, courts should not apply the presumption in those cases."[21] Jason further responds that we should not accord *Troxel* weight because the Texas statute granting standing to a nonparent to seek conservatorship or possession of a child is narrower than the "breathtakingly broad" Washington statute that the Supreme Court examined in *Troxel*.[22]

## II

A writ of mandamus will issue if a trial court abuses its discretion and no adequate remedy by appeal exists.[23] In determining whether to grant mandamus relief, an appellate court should defer to the trial court's factual determinations supported by the record.[24] But an appellate court may grant mandamus relief if the trial court "fails to correctly analyze or apply the law."[25] And we previously have granted relief to require a trial court to vacate orders erroneously permitting nonparents access to a child over a fit parent's objection.[26] In that case, after concluding that the temporary orders "divest[ed] a fit parent of possession of his children," we observed that "[s]uch a divestiture is irremediable, and mandamus relief is therefore appropriate."[27]

---

[21] *Id.* at 343.

[22] *Troxel v. Granville*, 530 U.S. 57, 67 (2000) (plurality opinion).

[23] *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding).

[24] *See Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding).

[25] *In re Ford Motor Co.*, 165 S.W.3d 315, 317 (Tex. 2005) (per curiam); *see In re Tex. Dep't of Family & Protective Servs.*, 210 S.W.3d 609, 612 (Tex. 2006) (orig. proceeding) (citing *Walker*, 827 S.W.2d at 839–40).

[26] *In re Derzapf*, 219 S.W.3d 327, 334–35 (Tex. 2007) (per curiam).

[27] *Id.* at 335 (citing *In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (per curiam) (noting parties' agreement that mandamus relief is appropriate if the trial court's temporary orders granting possession of a child to a nonparent were a clear abuse of discretion)); *see Little v. Daggett*, 858 S.W.2d 368, 369 (Tex. 1993) (per curiam) (granting mandamus relief to vacate trial court's temporary orders granting visitation in a suit to establish paternity); *Dancy v. Daggett*, 815 S.W.2d 548, 549 (Tex. 1991) (per curiam) (holding that mandamus was an appropriate remedy because "the trial court's issuance of temporary orders [was] not subject to interlocutory appeal").

## A

The United States Supreme Court has long held that the Constitution "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[28] This recognition stems from "a strong tradition of parental concern for the nurture and upbringing of their children."[29] The Supreme Court's jurisprudence rejects "any notion that a child is 'the mere creature of the State,'" but instead holds "that parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.'"[30] Accordingly, "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[31]

A majority of the *Troxel* Court found protection for this fundamental right—"perhaps the oldest of the fundamental liberty interests recognized by this Court"—within the Fourteenth Amendment.[32] The parties in this case do not disavow that protection. And the justices in *Troxel*

---

[28] *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion); *see id.* at 77 (Souter, J., concurring) ("We have long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment."); *id.* at 80 (Thomas, J., concurring) (agreeing with the plurality that there is a "fundamental right of parents to direct the upbringing of their children").

[29] *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) (holding compulsory school-attendance law unconstitutional as applied to members of certain Amish communities); *see Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.").

[30] *Parham*, 442 U.S. at 602 (alteration in original) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925)).

[31] *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)); *see Meyer v. Nebraska*, 262 U.S. 390, 399, 403 (1923) (holding unconstitutional a state statute banning the teaching of foreign languages to schoolchildren because parents enjoy the right to "establish a home and bring up children"); *Pierce*, 268 U.S. at 534–35 (striking down a state law requiring all children to attend public school because parents have a right to "direct the upbringing and education of children under their control").

[32] *Troxel*, 530 U.S. at 65 (plurality opinion); *see id.* at 77 (Souter, J., concurring) ("We have long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment.").

who might not root this right in substantive-due-process jurisprudence nevertheless similarly recognized a "fundamental right of parents to direct the upbringing of their children."[33]

Texas jurisprudence underscores this fundamental right, and we too recognize that it gives rise to a "legal presumption" that it is in a child's best interest to be raised by his or her parents.[34] Although the best interest of the child is the paramount issue in a custody determination, "[t]he presumption is that the best interest of the children" is served "by awarding them" to a parent.[35] Thus, the fit-parent presumption is "deeply embedded in Texas law" as part of the determination of a child's best interest.[36]

The Texas Legislature does not disagree. Five years before *Troxel*,[37] the legislature added a statutory parental presumption applicable to original custody determinations:

> [U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.[38]

---

[33] *Id.* at 80 (Thomas, J., concurring); *id.* at 91 (Scalia, J., dissenting) (noting that the right "is among the 'unalienable Rights' with which the Declaration of Independence proclaims 'all men . . . are endowed by their Creator'" and "among the 'othe[r] [rights] retained by the people' which the Ninth Amendment says the Constitution's enumeration of rights 'shall not be construed to deny or disparage.'" (alteration in original)); *id.* at 95 (Kennedy, J., dissenting) ("As our case law has developed, the custodial parent has a constitutional right to determine, without undue interference by the state, how best to raise, nurture, and educate the child.").

[34] *Taylor v. Meek*, 276 S.W.2d 787, 790 (Tex. 1955).

[35] *Id.* (quoting *Taylor v. Taylor*, 42 S.W.2d 455, 456 (Tex. App.—Waco 1931, no writ)).

[36] *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990)).

[37] Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 149 (codified at TEX. FAM. CODE § 153.131).

[38] TEX. FAM. CODE § 153.131(a).

The statute that grants standing to intervene in custody cases, however, does not include that presumption.[39] Nor does the Family Code's general modification statute, which authorizes a court to modify a custody order if it is "in the best interest of the child" and "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed."[40]

Relying on the absence of a statutory presumption in the standing and modification statutes, Jason argues that a fit-parent presumption does not apply in this modification proceeding. Abigail's father responds that the fit-parent presumption found in our common law and in *Troxel* is distinct from chapter 153's statutory presumption and embedded within any best-interest determination for a child—including that required to modify an existing child custody order under Family Code chapter 156.

**B**

*Troxel*'s underlying facts are strikingly similar to this case: there, the trial court ordered that the paternal grandparents have court-ordered visitation with their two grandchildren after the children's father died.[41] The children's mother challenged the order and the Washington statute that permitted the grandparents' intervention on the basis that the order infringed on her right as a presumptively fit parent to make decisions in her children's best interest. The Supreme Court of Washington agreed and set aside the order, holding the statute unconstitutional.[42]

---

[39] *Id.* § 102.003.

[40] *Id.* § 156.101(a)(1).

[41] *Troxel v. Granville*, 530 U.S. 57, 60–61 (2000) (plurality opinion).

[42] *Id.* at 62–63 (citing *In re Smith*, 969 P.2d 21, 28–30 (Wash. 1998)). The Washington statute challenged in *Troxel* provided that "[a]ny person may petition the court for visitation rights at any time including, but not limited to, custody proceedings." *Id.* at 61.

The United States Supreme Court affirmed. The *Troxel* plurality concluded that the statute was unconstitutional because it subjected "any decision by a parent concerning visitation of the parent's children" to court review and "gave no special weight" to the mother's "determination of her daughters' best interests."[43] The statute thus unconstitutionally permitted a court to "disregard and overturn any decision by a fit custodial parent concerning visitation . . . based solely on the judge's determination of the child's best interests."[44]

As with Abigail's grandparents, the grandparents in *Troxel* did not allege that the children's mother was an unfit parent.[45] "That aspect of the case is important," the plurality emphasized, "for there is a presumption that fit parents act in the best interests of their children."[46] The Court rejected the notion that a fit parent's desire about visitation is merely a factor in determining best interest, expressly disapproving of the trial court's explanation that "I think [visitation with the grandparents] would be in the best interest of the children and I haven't been shown it is not in [the] best interest of the children."[47] The plurality observed that this was "exactly the opposite" of the constitutionally enshrined presumption that it is the fit parent who makes that decision, free from government interference.[48] Accordingly, the plurality observed, "so long as a parent

---

[43] *Id.* at 67, 69.

[44] *Id.* at 67 (emphasis removed).

[45] *Id.* at 68.

[46] *Id.* (citing *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("[O]ur constitutional system long ago rejected any notion that a child is 'the mere creature of the State' and, on the contrary, asserted that parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.' . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." (first alteration in original)).

[47] *Id.* at 69.

[48] *Id.*

adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."[49]

This case presents parallel facts. Like the grandparents in *Troxel*, Jason argues that it is in Abigail's best interest to continue a relationship with him and her grandparents, and both sought court intervention to order that it happen. But Jason does not argue—nor did the trial court find—that Abigail's father is an unfit parent.

The trial court held two evidentiary hearings. Both Jason and Abigail's grandmother described their involvement in Abigail's life, their desire to continue a relationship with her, and their belief that court-ordered visitation is in her best interest. Both conceded that Abigail's father had allowed her grandparents and Jason some visitation but noted that visitation invitations had become less frequent during this litigation. Jason further testified that he had fulfilled a parental role to Abigail while Abigail resided with her mother. He cared for and disciplined Abigail, prepared meals for her, bathed her, and helped her get ready for school or for bed. Jason asked the

---

[49] *Id*. at 68–69. In a plurality decision, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Worthy v. Collagen Corp.*, 967 S.W.2d 360, 368 (Tex. 1998) (citations omitted). In *Troxel*, the two concurring justices—Justices Souter and Thomas—each reiterated that the trial court had no basis to override the mother's fundamental right to make decisions regarding her children. Justice Souter would have affirmed "based on the text of the statute alone, not its application to any particular case." *Troxel*, 530 U.S. at 76 (Souter, J., concurring). He emphasized, however, that "[w]e have long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected," and the Court's "recognized right of upbringing would be a sham if it failed to encompass the right to be free of judicially compelled visitation by 'any party' at 'any time' a judge believed he 'could make a "better" decision' than the objecting parent." *Id.* at 77–78 (footnote omitted). Similarly, Justice Thomas agreed "with the plurality that [the] Court's recognition of a fundamental right of parents to direct the upbringing of their children resolves this case." *Id.* at 80 (Thomas, J., concurring). Justice Thomas would have applied "strict scrutiny to infringements of" that right, observing that "the State of Washington lacks even a legitimate government interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties." *Id.* We discern nothing in the three opinions that would compel a different outcome here.

court to name him a joint managing conservator because his access to Abigail is otherwise at her father's "sole discretion," and it is in Abigail's best interest to keep "all of her family in her life."

Jason recognized, however, that Abigail's father always has been active in Abigail's life. Jason does not seek to remove Abigail's father as a managing conservator because "as a parent, [her father] may have a little bit stronger voice," and her father "is her dad."

A therapist who had seen Abigail before her mother's death expressed "concerns" about Abigail's father's parenting style but not that he is an unfit parent. The one concern she noted was a report that Abigail's father allegedly had spanked Abigail, but the therapist did not offer specifics and conceded that she did not know the reason for it. Abigail's grandmother similarly expressed nonspecific "concerns" about Abigail's father's parenting. But she conceded that Abigail's father is "active in [Abigail's] life." And she does not contend that Abigail's father "is not fit to be joint managing conservator" or that he is "a danger to [Abigail's] physical or emotional health."

Abigail's father testified that, after her mother's death, he changed Abigail's counselor to one who specializes in child trauma. That counselor testified that Abigail's father is "a good dad" who is "focused on what we need to do to help [Abigail] get to the best place possible." She observed that Abigail is "happy, healthy," and "progressing." She testified that Abigail's father has fully embraced counseling for Abigail and implemented the counselor's recommendations.

Abigail's father's testimony over the course of the two hearings presents no evidence that he is anything other than a loving and attentive parent to Abigail. He played an active role in Abigail's life before her mother's death, with Abigail living with him nearly half the time after she turned three. There is no evidence that Abigail's father did not adequately care for her physical or emotional needs. He actively encouraged and attended her activities. Abigail is now in preschool

and "knows the alphabet in English and in Spanish," "knows her numbers in English and in Spanish," and "can write her name." Abigail's father works with Abigail on the skills she learns at school "nightly." Abigail and her father attend church services together.

Though he objects to court-ordered visitation, Abigail's father testified that her grandparents could see Abigail on "a regular basis" in the future and that Jason could also visit Abigail with others present. Abigail's father talks with Abigail about her mother to help Abigail remember her: "[W]e look at pictures together. We talk about her mom, what she liked about her mom, different things as it reminds her of her mom." Since Abigail's mother's death, Abigail's father has married a fifth-grade school teacher. Abigail's father characterizes Abigail's relationship with her stepmother as "very loving" and "healthy," describing his wife as "a perfect role model for [Abigail] given the situation that we're in."

In awarding Jason visitation and overnight possession over Abigail's father's objection, the trial court essentially substituted its determination of Abigail's best interest for her father's, stating, "The court has determined what is in [Abigail's] best interest, and you are to make this as agreeable as you can force yourself to do." Like the trial court's decision in *Troxel*, the trial court's decision in this case reflected "exactly the opposite" of a parental presumption.[50] The court instead placed on a fit parent "the burden of *disproving* that visitation would be in the best interest of [his child]."[51]

---

[50] *Id.* at 69 (plurality opinion).

[51] *Id.*

We agree that the "nonparent standing threshold in Texas is . . . much higher and narrower than the one rejected in *Troxel*."[52] Texas has a standing statute for grandparents specifically and another for nonparents, including grandparents, who have exercised actual care, control, and possession of the child.[53] The grandparent-specific statute requires grandparents seeking to intervene in a pending suit to demonstrate that appointment of a parent as sole managing conservator would "significantly impair the child's physical health or emotional development."[54] Grandparents who establish standing carry a further burden on the merits that echoes the *Troxel* plurality: they must "overcome the presumption that a parent acts in the best interest of the parent's child by proving by a preponderance of the evidence that the denial of possession of or access to the child would significantly impair the child's physical health or emotional well-being."[55] The court of appeals concluded that Abigail's grandparents could not clear the standing threshold.[56]

But the nonparent standing statute does not import a fit-parent presumption into custody modification proceedings.[57] Those who establish such standing face a different burden under the

---

[52] *In re H.S.*, 550 S.W.3d 151, 162 (Tex. 2018).

[53] TEX. FAM. CODE §§ 102.003(a)(9), .004.

[54] *Id.* § 102.004(b) (granting a "grandparent or other person . . . deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit . . . if there is satisfactory proof to the court that appointment of a parent as sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development").

[55] *Id.* § 153.433(b)(2). In 2005, this subsection was amended in light of *Troxel*. The amended statute replaced a "best interest of the child" standard for awarding possession and access to grandparents with a specific requirement that grandparents "overcome[] the presumption that a fit parent acts in the best interest of the parent's child." Act of May 26, 2005, 79th Leg., R.S., ch. 484, § 4, 2005 Tex. Gen. Laws 1345, 1345.

[56] *In re Clay*, No. 02-18-00404-CV, 2019 WL 545722, at *4–6 (Tex. App.—Fort Worth Feb. 12, 2019, orig. proceeding [mand. denied]) (mem. op.).

[57] The court of appeals held that Jason could establish standing under sections 102.003(a)(9) and (a)(11), which respectively confer standing on "a person . . . who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition" and "a person with

16

modification statute—a court may modify a custody order if it is "in the best interest of the child" and "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed."[58] As Jason observes, the statute places no burden on him to overcome a fit-parent presumption.

In *In re H.S.*—a standing case—we recognized that "[i]n stark contrast to the Washington statute at issue in *Troxel*," section 102.003(a)(9) "allows only nonparents who have exercised 'actual care, control, and possession' of a child for at least six months" to seek conservatorship or possession of a child.[59] Thus, we held that the standing threshold in subsection (a)(9) "does not unconstitutionally interfere with parents' fundamental liberty interest in raising their children."[60] But we carefully expressed "no opinion" as to whether the grandparents in that case were "entitled to conservatorship or visitation rights," cautioning that the standing statute "addresses only who may file a suit affecting the parent-child relationship, not what a petitioner must show to obtain the relief she seeks."[61]

Jason relies on *H.S.* to suggest that *Troxel* is completely inapplicable to the narrower Texas nonparent-standing statute. *Troxel*, however, did not turn merely on the breadth of those granted standing to seek court-ordered access to a child; it also held that a statute that curtails a presumptively fit parent's rights is unconstitutional. The Washington statute unconstitutionally

---

whom the child and the child's . . . parent have resided for at least six months ending not more than 90 days preceding the date of the filing of the petition if the child's . . . parent is deceased at the time of the filing of the petition." *Id.* at *6–9 (quoting TEX. FAM. CODE § 102.003(a)(9), (11)).

[58] TEX. FAM. CODE § 156.101(a).

[59] 550 S.W.3d 151, 161–62 (Tex. 2018) (quoting TEX. FAM. CODE § 102.003(a)(9)).

[60] *Id.* at 163.

[61] *Id.* at 162–63.

infringed on the mother's "fundamental parental right" because it "contain[ed] no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever."[62] Although Texas has narrowed the classes of nonparents who may assert standing in child custody proceedings to comport with one aspect of *Troxel*, we do not agree that this distinction resolves the separate constitutional infirmity that can result when a court's best-interest determination overrides the expressed desires of a fit parent. Accordingly, we conclude that a court must apply the presumption that a fit parent—not the court—determines the best interest of the child in any proceeding in which a nonparent seeks conservatorship or access over the objection of a child's fit parent.

Though Jason challenges the applicability of the fit-parent presumption, he does not contend that he adduced evidence in the trial court that overcomes that presumption. Jason instead asserts that we previously rejected requiring such a presumption in modification proceedings, relying on two cases: *In re V.L.K.*[63] and *Taylor v. Meek*.[64] Neither case, however, involved a modification proceeding in which a fit parent had been named the child's managing conservator in the order sought to be modified. In *V.L.K.*, the child's imprisoned mother had consented to the appointment of the child's maternal grandmother as managing conservator.[65] The child's paternal aunt and uncle moved to modify the agreed decree, seeking to be appointed the child's joint

---

[62] *Troxel v. Granville*, 530 U.S. 57, 67 (2000) (plurality opinion). As Justice Thomas further observed, "the State of Washington lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties." *Id.* at 80 (Thomas, J., concurring).

[63] 24 S.W.3d 338, 339–40 (Tex. 2000).

[64] 276 S.W.2d 787, 790 (Tex. 1955).

[65] 24 S.W.3d at 340.

managing conservators.[66] The trial court instructed the jury: "There is no presumption that a parent should be appointed managing conservator if there has previously been an order of custody awarding conservatorship to a third party, or if the parent has voluntarily relinquished actual care, control, and possession of the child to a nonparent."[67]

Because the mother had relinquished managing conservatorship of the child, we concluded that the jury instruction was within the trial court's discretion, observing that the statutory presumption in chapter 153, which governs original proceedings, is not found in chapter 156.[68] And we acknowledged that the legislature had its reasons for doing so: "Chapter 156 modification suits raise additional policy concerns such as stability for the child and the need to prevent constant litigation in child custody cases."[69] Thus, "the Legislature balanced the rights of the parent and the best interest of the child," recognizing that "it is the public policy of this State to resolve conservatorship disputes in a manner that provides a safe, stable, and nonviolent environment for the child."[70] Further, the modification statute reflects the understanding that "[t]he first judgment at the time it was entered was res adjudicata of the question of the child's best interest and of the custody."[71]

Because the mother in *V.L.K.* had relinquished managing conservatorship of her child to a third party—the child's grandmother—the initial custody order reflected that the parental

---

[66] *Id.*

[67] *Id.* at 340–41.

[68] *Id.* at 343.

[69] *Id.*

[70] *In re C.A.M.M.*, 243 S.W.3d 211, 216 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (emphasis removed) (quoting TEX. FAM. CODE § 153.001(a)(2)).

[71] *Taylor v. Meek*, 276 S.W.2d 787, 790 (Tex. 1955).

presumption had been overcome. Similarly, in *Taylor v. Meek*, a father sought to modify a court order *after* the grandparents had been named managing conservators of his daughter.[72] We acknowledged that "it cannot now be questioned that at that time it was to the best interest of the child to award custody to the grandparents."[73] Thus, in both cases, the parent attempted to reassert a right that the parent had relinquished. By contrast, in this case, Abigail's father did not relinquish his right as her managing conservator in the original custody determination, nor did the trial court find him unfit.

Neither *V.L.K.* nor *Taylor* addressed the *Troxel* presumption, the former decided about two weeks after *Troxel* and the latter decades earlier. Since *Troxel*, we have consistently applied *Troxel*'s holding that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family."[74] Although a statutory presumption is inapplicable to a chapter 156 modification proceeding, we read that chapter to avoid potential constitutional infirmities.[75] Thus, we read any best-interest determination in which the court weighs a fit parent's rights against a claim to conservatorship or access by a nonparent to include a presumption that a fit parent acts in his or her child's best

---

[72] *Id.* at 788.

[73] *Id.* at 790.

[74] *See In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007) (per curiam) (quoting *Troxel v. Granville*, 530 U.S. 57, 68 (2000) (plurality opinion)); *In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (per curiam) (quoting same).

[75] *See* TEX. GOV'T CODE § 311.021(1) ("In enacting a statute, it is presumed that . . . compliance with the constitutions of this state and the United States is intended . . . ."); *In re Green*, 221 S.W.3d 645, 649 (Tex. 2007) (per curiam) ("We must of course avoid a construction of a statute that renders it unconstitutional."); *see also United States v. Albertini*, 472 U.S. 675, 680 (1985) ("Statutes should be construed to avoid constitutional questions . . . ."); *In re Pensom*, 126 S.W.3d 251, 256 (Tex. App.—San Antonio 2003, no pet.) (holding that the Family Code's grandparent-access statute's "best interest of the child" standard in place before amendments in light of *Troxel* could be constitutionally construed to require grandparents to overcome the presumption that a fit parent acts in the best interest of his or her child).

interest.[76] Such a presumption is consistent with the child's own interest in the "familial relationship," which "stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children."[77] Under these facts, Abigail's father is entitled to a presumption that he determines Abigail's best interest based on his fundamental right as a fit parent.

Our holding does not alter the burden of proof for modifications of court-ordered custody arrangements in which neither parent is named a managing conservator in the original order.[78] But when nonparents seek court-ordered custody of a child subject to an existing order, under which one or both fit parents were appointed managing conservators, that parent or parents retain the presumption that protects their fundamental right to determine their child's best interest.[79]

---

[76] *See Taylor*, 276 S.W.2d at 790 ("The paramount right of a . . . parent to a child comes from a legal presumption that to be raised by its . . . parents is to the child's best interest."); *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990) ("The presumption that the best interest of a child is served by awarding custody to a . . . parent is deeply embedded in Texas law." (citing *Mumma v. Aguirre*, 364 S.W.2d 220, 221 (Tex. 1963), and *Legate v. Legate*, 28 S.W. 281, 282 (1894))).

[77] *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 844 (1977) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972)).

[78] As the Nevada Supreme Court has stated in construing a modification statute without a parental presumption: "When a nonparent obtains visitation through a court order or judicial approval, they have successfully overcome the parental presumption and are in the same position as a parent seeking to modify or terminate visitation." *Rennels v. Rennels*, 257 P.3d 396, 401 (Nev. 2011).

[79] In a few cases, courts of appeals have held *Troxel* inapplicable to a modification proceeding based on our holding in *In re V.L.K. See, e.g., Spencer v. Vaughn*, No. 03-05-00077-CV, 2008 WL 615443, at *8 (Tex. App.— Austin Mar. 6, 2008, pet. denied) (mem. op.) (holding that grandparents seeking to modify custody "are bound by *In re V.L.K.* and the burdens of proof set out in chapter 156 rather than the chapter 153 presumptions and *Troxel v. Granville*"); *In re M.P.B.*, 257 S.W.3d 804, 810 (Tex. App.—Dallas 2008, no pet.) (declining to apply *Troxel* in a modification proceeding and framing the issue as "whether [the grandparent] has standing to file suit because there are special circumstances warranting interference with Father's parental rights to primary care, custody, and control of [the child]"); *In re M.A.S.*, No. 04-06-00629-CV, 2007 WL 2608552, at *2 (Tex. App.—San Antonio Sept. 12, 2007, no pet.) (mem. op.) (holding, after discussing *Troxel*, that "the parental presumption does not apply in modification suits"); *In re M.N.G.*, 113 S.W.3d 27, 33 (Tex. App.—Fort Worth 2003, no pet.) (declining to apply *Troxel* because it "involved a visitation statute, not a statute dealing with modification of custody"). To the extent these cases conflict with our holding today, we disapprove of them.

21

## D

Finally, we reject Jason's argument that Abigail's father "affirmatively sought the court's intervention" and thus "waived the parental presumption in any later modification suit."[80] Abigail's father filed the original suit affecting the parent-child relationship in this case that resulted in the order naming him a joint managing conservator, and he also sought temporary orders in this modification proceeding.

A fit parent does not forgo the right to parent a child by seeking to exercise that right. A child does not become a "creature of the State," subject to the court's unfettered determination of the child's best interest, because a presumably fit parent invoked the judicial process to establish his or her conservatorship of the child.[81]

\* \* \*

When a nonparent requests conservatorship or possession of a child, the child's best interest is embedded with the presumption that it is the fit parent—not a court—who makes the determination whether to allow that request. No party alleges, no evidence demonstrates, and no court finding exists that Abigail's father is unfit to be her parent. Nor is there evidence or findings rebutting the resulting presumption that Abigail's father acts in her best interest. The trial court thus abused its discretion in ordering, over the objection of Abigail's father, that Jason be named Abigail's possessory conservator with rights to possession of the child. Accordingly, we

---

[80] Jason further contends that Abigail's father waived his complaint under the invited-error doctrine because Abigail's father filed a proposed judgment. *See Casu v. Marathon Ref. Co.*, 896 S.W.2d 388, 389 (Tex. App.—Houston [1st Dist.] 1995, writ denied). "When a party specifically seeks entry of an order in a particular form," Jason contends, "the party cannot then complain about the entry of the order in the form requested." Abigail's father, however, objects to the substance of the order, not merely its form; thus, this complaint is without merit.

[81] *See Parham v. J. R.*, 442 U.S. 584, 602 (1979) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925)).

conditionally grant the petition for writ of mandamus and direct the trial court to vacate its temporary orders. We are confident the trial court will comply; our writ will issue only if it fails to do so.

 

 

_____
Jane N. Bland
Justice

**OPINION DELIVERED:** June 26, 2020